**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

NANCY ENGLAR and CAROL DIEHL,

              Plaintiffs,              CASE NO. 04-CV-73977

-vs-                             PAUL D. BORMAN
                                  UNITED STATES DISTRICT JUDGE

41B DISTRICT COURT, et al.,

              Defendants.

AND

PATRICIA BARACHKOV,

              Plaintiff,              CASE NO. 04-CV-73957

-vs-                             PAUL D. BORMAN
                                  UNITED STATES DISTRICT JUDGE

41B DISTRICT COURT, et al.,

              Defendants.

_____/

**ORDER**
**(1) GRANTING DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT ON COUNTS I AND II;**
**AND (2) DISMISSING WITHOUT PREJUDICE PLAINTIFF'S**
**PENDANT STATE LAW CLAIMS**

      Plaintiff Patricia Barachkov filed the instant Complaint on October 8, 2004 (Case No. 04-

73957). Plaintiffs Carol Diehl and Nancy Englar filed their Complaint on October 12, 2004.

(Case No. 04-73977). On March 31, 2006, this Court ordered that the cases be consolidated into

one action under Case No. 04-73977. (Docket No. 62).

      Defendant Michigan District Judge Davis filed her Motion for Summary Judgment on

1

February 2, 2006. (Docket No. 43). Defendants 41B District Court and Clinton Township filed

their Motion for Summary Judgment on February 3, 2006. (Docket No. 46). Plaintiffs filed their

Joint Response to Defendants' Motion for Summary Judgment on March 7, 2006. (Docket No.

52). Defendants filed Replies on March 22, 2006. (Docket Nos. 57 & 58). Both parties then

submitted several supplemental briefs. The Court held a hearing on Defendants' Motion for

Summary Judgment on April 27, 2006. Thereafter, Plaintiffs filed a Supplemental Brief dealing

with the issue of Eleventh Amendment immunity on July 5, 2006. (Docket No. 65). Defendant

Judge Davis filed a Supplemental Brief in Response on July 14, 2006. (Docket No. 67). Plaintiffs

submitted a Sur-Reply on July 20, 2006. (Docket No. 68) and a Supplemental Brief to the Sur-

Reply on August 8, 2006. (Docket No. 70).

Plaintiffs Barachkov, Diehl, and Englar ("Plaintiffs") assert the following seven causes of

action against Defendants 41B District Court, Clinton Township, and Chief Judge Linda Davis

("Judge Davis"), in both her individual and official capacities:

| | |
|---|---|
| Count I. | 42 U.S.C. § 1983: Freedom of Speech and Association |
| Count II. | 42 U.S.C. § 1983: Procedural Due Process |
| Count III. | Wrongful Discharge / Breach of Implied Contract and Legitimate Expectations |
| Count IV. | Tortious Interference with a Contractual Relationship / Business Expectancy |
| Count V. | Defamation |
| Count VI. | Michigan Whistleblower Protection Act |
| Count VII. | Public Policy Tort |

I.   **FACTS**

Plaintiffs essentially allege that they were wrongfully terminated from their employment

in July 2004 as a result of an investigation performed by the Michigan State Court

Administrative Office ("SCAO") into alleged wrongdoing at 41B District Court in Clinton

2

Township, MI. Plaintiff Barachkov was hired in 2000 as a criminal deputy clerk. Plaintiff Diehl was hired in 1990 as a cashier/account clerk and held that position until her termination. Plaintiff Englar was hired in 1981 as a landlord-tenant clerk and held the position of chief probation officer when she was terminated.

41B District Court included two divisions, with Chief Judge Linda Davis and Judge John Foster sitting in Mount Clemens, MI, and Judge William Cannon sitting in Clinton Township, MI. For some time, Chief Judge Davis advocated the merger of the Mount Clemens and Clinton Township divisions of the court. Judge Cannon objected to this proposed merger as well as its timetable. Plaintiffs were all closely-associated with Judge Cannon and his family. Plaintiff Englar was the sister of Judge Cannon's wife, Peggy McBride Cannon, who worked as the Court Administrator.

Even though court employees at the Mount Clemens division were unionized, the court employees at Clinton Township were not. Plaintiffs maintain that Chief Judge Davis opposed the unionization of the court employees in the Clinton Township Division and made anti-union statements. On June 28, 2004, Plaintiff Englar hosted a union-organizational meeting at her home with representatives from AFSCME to determine whether there existed sufficient interest to form a union. All court employees, including Plaintiffs Barachkov and Diehl, attended the meeting. Plaintiff Englar further agreed to act as a contact person in the effort to organize a union.

On June 28, 2004, Chief Judge Linda Davis held a meeting with the court employees of 41B District court to announce that state government officials would be conducting a "management oversight review" where each employee would be interviewed. Chief Judge Davis

3

represented that 41B District court was overstaffed by about ten (10) to fifteen (15) employees and that no one would lose their jobs if they were honest with the interviewer.

On July 6, 2004, Deb Green from the SCAO interviewed Plaintiff Englar. On July 9 and 15, 2004, Plaintiff Diehl was interviewed first by the SCAO's John Ferry, and then by Deb Green. On July 13, 2004, Green interviewed Plaintiff Barachkov. Plaintiffs allege that during the course of the interview, Green asked Plaintiffs questions about which they had no personal knowledge. Additionally, despite numerous leading questions, Plaintiffs contend that they refused to provide false or misleading information on the subject of possible wrongdoing by the court personnel.

On July 15, 2004, Chief Judge Davis terminated the employment of all Plaintiffs. Chief Judge Davis informed the Plaintiffs that there termination was a result of their responses at the management oversight review, and did not provide them any additional notice, warning, a hearing, or any disciplinary steps. Plaintiffs aver that the true motivation for their termination was because of their failure to provide false information to the SCAO during the interview, their close association with Judge Cannon, and their union organizational efforts. Furthermore, Plaintiffs maintain that their terminations were a result of Chief Judge Davis's desire to advance her political and personal agenda.

On or about July 15, 2004, Chief Judge told a reporter with the Detroit News that Plaintiffs had been fired for lying during the interviews. The statement appeared in the Detroit News in July 2004..

First, Plaintiffs allege a First Amendment violation through retaliatory termination for their failure to provide false information to the SCAO, close association with the Cannons, and

union organizational efforts. Plaintiffs further claim that Defendants violated their procedural due process rights by not affording them notice or a hearing in connection with their termination. Additionally, Plaintiffs allege that their substantive due process rights were violated because of the failure of Defendants to provide a name-clearing hearing as a result of Chief Judge Davis's public comments about their termination.

Plaintiffs claim various state-law grounds for relief, including (1) wrongful discharge, (2) tortious interference with a contractural relationship, (3) defamation, (4) a public policy tort, and (5) a violation of Michigan's Whistleblower Protection Act.

Plaintiffs base their wrongful discharge claim on their theory of an implied contract theory of "just cause" employment. Plaintiffs further claim that Chief Judge Davis, without justification, acted outside the scope of her authority by intentionally and improperly interfering with Plaintiffs' advantageous employment situation.

Plaintiffs maintain a defamation claim on the basis that Chief Judge Davis reported to a local newspaper and to other third parties, with knowledge that the information was false or misleading, that Plaintiffs lied during the SCAO investigation.

Plaintiffs claim a violation of the Whistleblower Protection Act because Chief Judge Davis allegedly terminated Plaintiffs' employment as a result of their telling the truth to a investigation conducted by a public body.

Plaintiffs claim a public policy tort on the grounds of wrongful termination of Plaintiffs for their refusal to violate the law by lying to a governmental body.

Defendants respond that the SCAO investigation into 41B District Court was prompted by reports that the Court Administrator, Judge Cannon's wife, Peggy McBride Cannon only

sporadically attended work and that the Judge had court employees perform personal services for him during court hours. Peggy McBride Cannon was subsequently terminated from her position. During the course of its investigation into these reports, the SCAO's Deb Green interviewed all thirty four (34) court employees and determined that these abuses were pervasive and well-known. However, during the course of the interviews of Plaintiffs, Green became convinced that they were either misrepresenting what they knew about these reports, or covering up for the Cannons. Comparing Plaintiffs' interview responses with the statements from the thirty-one (31) other court employees, Green became convinced that Plaintiffs were lying and recommended to Chief Judge Linda Davis that they be terminated.

As to Plaintiffs' First Amendment claim, Defendants argue that Plaintiffs have no evidence linking any of their three proffered reasons to their termination. As to Plaintiffs' due process claims, Defendants dispute that Plaintiffs were "just cause" rather than "at will" employees, and that Plaintiffs never requested a name-clearing hearing.

## II.   ANALYSIS

### A.   Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

*Id.* at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of

7

evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

**B.    Sovereign Immunity for 41B District Court and Defendant Judge Davis in Her Official Capacity**

1.    *41B District Court and Clinton Township*

The Court finds that all claims for money damages and injunctive relief against Defendant 41B District Court are barred by sovereign immunity.

The Eleventh Amendment bars suits brought by private citizens against a state government in federal court without the state's consent. *Welch v. Texas Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 489-90 (1987). However, sovereign immunity does not extend to local political subdivisions such as counties or municipalities. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). The Sixth Circuit looks to the following factors to determine whether an entity is an "arm of the state" entitled to sovereign immunity: "(1) whether the state would be responsible for a judgment against the entity in question; (2) how state law defines the entity; (3) what degree of control the state maintains over the entity; and (4) the source of the entity's funding." *S.J. v. Hamilton County, Ohio*, 374 F.3d 416, 420 (6th Cir. 2004). However, the most important factor is whether the state would be responsible for paying the judgment. *Id.*

Plaintiffs allege § 1983 claims against both 41B District Court and Clinton Township. First, it is clear that the employees of 41B District Court are employees of the state judicial branch and not employees of Clinton Township. Michigan law recognizes that employees of the judicial branch "are not employees of the county, city, or other district control unit, even though

8

they are paid by the district control unit." *Judges of the 74th Judicial District v. Bay County*, 385 Mich. 710, 723 (1971). Second, as a matter of law, this Court finds that Defendant 41B District Court is an "arm of the state" entitled to sovereign immunity in suits for damages in federal court. *See Smith v. Oakland County Circuit Court*, 344 F. Supp. 2d 1030, 1055 (E.D. Mich. 2004); *Geller v. Washtenaw County*, 2005 WL 3556247, *8 (E.D. Mich. 2005) (unpublished); *Evans v. Raines*, 2006 WL 2244139, *4 (W.D. Mich. 2006) (unpublished). Furthermore, Plaintiffs cannot claim any injunctive relief against a defendant arm of the State. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984). Therefore, the Court finds that (1) Defendant Clinton Township is entitled to summary judgment on the § 1983 claims and (2) Defendant 41B District Court is entitled to summary judgment on all state claims against it.

Furthermore, Plaintiffs cannot maintain an action based on 42 U.S.C. § 1983 against Defendant 41B District Court. An "arm of the state" is not a "person" for the purposes of liability under § 1983. *Alkire v. Irving*, 330 F.3d 802, 812 n.7 (6th Cir. 2003) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989)). Therefore, Plaintiffs' § 1983 claims against Defendant 41B District Court are summarily dismissed.

### 2.      *Judge Davis in Her Official Capacity*

Although Defendant Judge Davis in her official capacity is immune from suit insofar as Plaintiffs request money damages, *Edelman v. Jordan*, 415 U.S. 651, 663 (1974), state officials in their official capacity are not immune from claims for injunctive relief. *Ex Parte Young*, 209 U.S. 123, 155-56 (1908). When a plaintiff seeks injunctive relief, sovereign immunity will not block the suit even though the relief may affect the state treasury. *Edelman*, 415 U.S. at 667. Since Plaintiffs request from this Court injunctive remedies, such as reinstatement of

9

employment and a prohibition against future acts of retaliation, Defendant Judge Davis does not

enjoy sovereign immunity on these claims. *See, e.g., Cox v. Shelby Comm. College*, 48 Fed.

Appx. 500, 504 (6th Cir. 2002) (unpublished); *Dotson v. Griesa*, 398 F.3d 156, 178-79 (2d Cir.

2005) (collecting cases) (finding that sovereign immunity does not bar suits for reinstatement of

employment). Therefore, the Court finds that Defendant Judge Davis in her official capacity is

not entitled to sovereign immunity on the federal or state claims.

### C.      Liability of Defendant Judge Davis in her Official Capacity

In order to allege a claim against a state official in their official capacity, a plaintiff must

show a direct causal link between "a municipal policy or custom and the alleged violation of

constitutional rights." *Green v. Cook*, 83 Fed. Appx. 99, 100 (6th Cir. 2003) (unpublished)

(citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). The Supreme Court has held:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its
> employees or agents. Instead, it is when execution of a government's policy or custom,
> whether made by its lawmakers or by those whose edicts or acts may fairly be said to
> represent *official policy,* inflicts the injury that the government as an entity is responsible
> under § 1983.

*Monell*, 436 U.S. at 694 (emphasis added).

To establish a claim against a state official under *Monell*, the plaintiff must (1) identify a

state policy or custom; (2) connect that policy or custom to the state; and (3) show that the

execution of the policy or custom caused intentional injury. *Garner v. Memphis Police Dep't*, 8

F.3d 358, 364 (6th Cir. 1993). Although "the relevant custom need not have been formally

approved by the appropriate decisionmaker..., the custom must be so prevailing that it has

attained the 'force of law'." *Van Huss v. Shoffner*, 81 Fed. Appx. 17, 22 (6th Cir. 2003)

(unpublished) (citations omitted). Other than the general allegations in the Complaint, Plaintiffs

10

have not made any showing that Defendant Judge Davis' actions represented "official policy or custom" of the 41B District Court or the judicial branch of the State of Michigan. Without any showing of the above *Monell* factors, Plaintiffs cannot maintain an action against Defendant Judge Davis in her official capacity. Therefore, the Court summarily dismisses these claims.

### D.    Defendant Judge Davis is her Personal Capacity

#### 1.    *Absolute Immunity Defense*

Plaintiffs contend first that Defendant Judge Davis waived the absolute immunity defense by not raising it in the initial response. Second, Plaintiffs argue that Defendant Judge Davis is not shielded by absolute judicial immunity from the § 1983 claims since employment decisions are not "judicial" functions covered by the doctrine. The Court does not find the absolute immunity defense waived since (1) it is within the Court's discretion to entertain it and (2) Defendants did raise both governmental and qualified immunities in their initial Response to the Complaint. However, Defendant Judge Davis only raised the issue of absolute immunity in regards to the state law claims in her Motion for Summary Judgment. It is within the trial court's discretion to entertain an absolute immunity defense not raised in the initial responsive pleadings. *See Ireland v. Tunis*, 907 F. Supp. 1088, 1094-95 (E.D. Mich. 1995).

The Court finds that in this instance the doctrine of absolute judicial immunity does not shield Defendant Judge Davis from a § 1983 suit in her individual capacity. It is understood that "judges are entitled to absolute immunity from suits for money damages for all actions taken in the judge's judicial capacity, unless these actions are taken in complete absence of any jurisdiction." *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994). However, the Supreme Court has held that a state judge's decisions regarding employment are not "judicial" functions that are

11

entitled to absolute immunity. *Forrester v. White*, 484 U.S. 219, 229-30 (1988). Courts in the Sixth Circuit have held the same. *See, e.g., Bridges v. Senger*, 730 F. Supp. 1401, 1408 (W.D. Mich. 1990) (finding that a state probate court judge did not have absolute immunity from a § 1983 age discrimination claim); *Guercio v. Brody*, 814 F.2d 1115, 1120 (6th Cir. 1987), *modified on other grounds*, 911 F.2d 1179 (6th Cir. 1990) (holding that absolute immunity does not shield a judge from § 1983 actions based upon wrongful termination).

Since Plaintiffs allege wrongful employment termination in violation of their First and Fourteenth Amendment rights, the Court finds that Defendant Judge Davis is not entitled to absolute immunity from these claims.

2.    <em>Qualified Immunity Defense</em>

To survive an assertion of a qualified immunity defense to the § 1983 claims, Plaintiffs must show that Defendant's conduct "(1) violate[d Plaintiffs'] clearly established constitutional rights (2) of which a reasonable person would have known." *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997). A right is clearly established "if there is binding precedent from the Supreme Court, the Sixth Circuit, [. . .] the district court itself, or case law from other circuits which is directly on point." *Id*. (internal citations omitted). The Court finds that Defendant Judge Davis is entitled to qualified immunity on both federal constitutional claims.

**E.    First Amendment Freedom of Speech and Association Claims**

In order to overcome the first prong of the qualified immunity defense, there must be a showing that Defendants violated Plaintiffs' clearly established constitutional rights. In Count I of the Complaint, Plaintiffs allege that Judge Davis terminated Plaintiffs' employment because of (a) Plaintiffs' failure to provide "false or misleading testimony" concerning the SCAO

12

investigation, (b) Plaintiffs' association with Judge Cannon and his wife, and (c) Plaintiffs' efforts in unionizing efforts of court employees – in violation of their First Amendment rights of Speech and Free Association.

To state a prima facie case of First Amendment retaliation under 42 U.S.C. § 1983, Plaintiffs must demonstrate that he or she "(1) was engaged in a constitutionally protected activity, (2) was subjected to adverse action or deprived of some benefit, and (3) the protected speech was a 'substantial' or 'motivating factor' in the adverse action." *Farhart v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004). Furthermore, in determining if a public employer has violated a plaintiff's rights by terminating his employment for engaging in speech, this Court must engage in a three-part inquiry:

(1)    Whether the relevant speech addressed a matter of public concern;
(2)    If the speech is a matter of public concern, then the court must balance the interests of the public employee in commenting upon matters of public concern and the efficiency of the public services it performs through its services; and
(3)    Whether the employee's speech was a substantial or motivating factor in the employer's decision to take adverse employment action against the employee.

*Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (quotations and citations omitted). However, in the context of "public concern, when "an employee [speaks] upon matters only of personal interest. . . a federal court is not the appropriate forum to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. 138, 147 (1983); *see Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1186-87 (6th Cir. 1995). If the Court determines that the matter is of "public concern," it must apply the *Pickering* balancing test where it considers "whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission or the employer, create disharmony among co-workers, impair discipline by superiors,

13

or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Commonwealth of Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994); *see Pickering v. Bd. of Educ. of Township High School Dist. 205*, 391 U.S. 563, 568 (1968).

Plaintiffs first claim that Defendant Judge Davis terminated their employment for their failure to provide false information to the SCAO management investigation. At the outset, the Court is not convinced that Plaintiffs' speech in this instance was a matter of "public concern." Out of thirty-four (34) employees interviewed, thirty-one (31) reported that the Court Administrator was consistently absent from work and described various personal services performed by court employees for Judge Cannon. (Dep. Green p. 240-41).[1] The Plaintiffs were then terminated for misrepresenting the truth or feigning ignorance of these practices at the interview. (Dep. Green p. 241-44).

Plaintiffs' own deposition testimony compared with their interview responses demonstrates that they were not completely forthcoming at the investigation. Plaintiff Barachkov testified that when Deb Green asked her at the interview if she was aware of non-court related activities, she answered, "No," explaining that the employees could have been "sick, on vacation, at a dental appointment or took an early lunch." (Dep. Barachkov, p. 114).[2] Furthermore, she admitted that in response to a question concerning whether she herself performed, or knew of anyone who performed, non-court related activities, she answered, "No." (Dep. Barachkov, p. 114-15).

_____

[1] Excerpts from the deposition of Deborah Green are found in Defendant Linda Davis's Motion for Summary Judgment, Exhibit No. 7. (Docket No. 44).

[2] Excepts from the deposition of Patricia Barachkov are found in Defendant Linda Davis's Motion for Summary Judgment, Exhibit No. 5. (Docket No. 44).

14

However, at her deposition, Plaintiff Barachkov testified that she not only performed a personal service for Judge Cannon during court time but also knew that other employees were doing so as well:

Q:      So at some point during your employment you went to pick up the Judge's daughter from school?
A:      From the doctor's office. Foot doctor's office.
Q:      During a time when you were supposed to be working in court?
A:      I was asked by the Judge.
Q:      I understand that. During a time when you were supposed to be working at the court?
A:      Yes.
. . . .
Q:      So did you report performing this service with Liza Banka to Deb Green?
A:      No.
Q:      And why not?
A:      Because I didn't recall the incident.
. . . .
Q:      Were you aware of other 41B District Court employees performing services for Peggy McBride?
A:      I told Debra Green that I was not aware.
Q:      Are you aware?
A:      No, I'm not aware.
. . . .
Q:      Did you ever take the Cannons [sic] dog to the vet or grooming during court hours?
A:      No.
Q:      Are you aware of any other employees who have?
A:      Now I remember.
Q:      What are you aware of?
A:      That Jan Kenny was the girl that loved the pets and she did take the Judge's dog to the vets.
. . . .
Q:      Are you aware of anyone else – any other employer of the 41B District Court who performed any bookkeeping, checkbook balancing, check writing for the Cannons during court hours?
A:      I believe there was one person doing that.
Q:      Who was that?
A:      The blonde. I don't know.
. . . .
Q:      Did you tell Deb Green about this observation?
A:      No, I did not.

15

Q:      And why not?
A:      I didn't think about that. And she didn't ask me that question.
Q:      She didn't ask you a specific question about checking, balancing, that kind of
        thing?
A:      Correct.
Q:      She did ask you the general question about are you aware of any other persons
        performing services for the Cannons during court time, correct?
A:      Yes

(Dep. Barachkov, p. 117-19, 124, 127).

Similarly Plaintiff Diehl represented to Deb Green at the interview that (1) the Court

Administrator's attendance was "sporadic" over the past three to five years and (2) the Court

Administrator's typical work day was 10:00 a.m. to 3:00 p.m. (Dep. Diehl, p. 173-74).[3]

However, she stated at her deposition that she did not tell Deb Green this information because

she was not "specifically asked." (Dep. Diehl, p. 175).

Q:      Right. But when she started asking you questions about the court administrator's
        attendance, you knew that was an issue to be discussed, correct?
A:      And I gave those answers.
Q:      You gave me the answers that you told me about.
A:      That's the answers I gave her.
Q:      But you failed to tell her that she was rarely there in the last year of employment?
        MS. POLLICK:          Objection to form.
Q:      Is that right?
A:      Yes.
Q:      Were you trying to – by not giving that information, were you trying to protect
        Peggy?
A:      Mr. Ferrand, I was not deliberately giving that information. Deborah Green
        conducted her whatever you want to call it with me, I don't consider it an
        interview. That was about the amount of time she spent on those questions. The
        rest of the interview was about me taking checks and filing levies and she
        dismissed me.

(Dep. Diehl, p. 176).

--------

[3] Excepts from the deposition of Carol Diehl are found in Defendant Linda Davis's
Motion for Summary Judgment, Exhibit No. 6. (Docket No. 44).

Additionally, Plaintiff Diehl testified that the SCAO asked her whether she was aware if she or others were performing non-court related job functions for Judge Cannon. Plaintiff Diehl told the SCAO that she had taken Peggy Cannon's sister to the doctor and also knew that another employee took Judge Cannon's dog to the veterinarian. (Dep. Diehl, p. 177-78). However, at her deposition, she stated that she knew of other employee's doing Judge Cannon's Christmas shopping, washing his car, picking up his children from school, performing homework for the Judge's children, balancing the Judge's checkbook, wrapping presents, and helping the Judge move. (Dep. Diehl, p. 179-97). When asked why she did not relate all of these incidents to the SCAO, Plaintiff Diehl repeatedly responded that the SCAO "did not ask."

Finally, Plaintiff Diehl's testimony revealed that upon instruction from Peggy Cannon she personally participated in attempts to coerce other employees to misrepresent occurrences at 41B District Court.

> Q:  The [telephone] transcript identifies an unidentified speaker and I'm referring to the middle transcript that I highlighted for you. It says: Liza, it's Carol. I just talked to Nancy. Don't forget, any time you were doing anything, you were always on lunch hour or comp time. Okay.
> Do you recall leaving that message for [the Judge's secretary]?
> A:  You didn't finish it.
> Q:  Okay. I know. But do you recall leaving that portion of the message to Liza?
> A:  Something to that effect.

(Dep. Diehl, p. 207).

Plaintiff Englar recorded her conversation with the SCAO investigator with permission, although Englar testified at her deposition that at one point the cassette tape stopped. (Dep. Englar, p. 218).[4] In the recorded portion of interview, Plaintiff expressed the following when

---

[4] Excepts from the deposition of Nancy Englar are found in Defendant Linda Davis's Motion for Summary Judgment, Exhibit No. 3. (Docket No. 43).

17

asked about the attendance record of Peggy Cannon:

Q:      When was the last time you saw Peggy at work for a full day?
A:      Well, she's been on disability, let me think. Sometime in May. I think toward the end of May.
Q:      The end of May you saw her for how long?
A:      See, I'm upstairs and she' downstairs. It's kind a hard to tell, you know, when she got here and when she left.
Q:      Are you saying that towards the end of May, she was here full-time?
A:      Every day?
Q:      Uh-huh.
A:      I couldn't – I don't know for sure if it was every day. There's some days I don't even go down to court. We're upstairs the whole time in a different building and one person takes the mail down. She could have been there and left by the time I come down later in the afternoon. You know, there could be days that she was there and I just didn't go down to court.

(Def. Linda Davis's Mot. Summ. J., Ex.17, Plaintiffs' Admissions Re: Interview with the SCAO).

However, Plaintiff Englar testified to the following at her deposition concerning Peggy

Cannon:

Q:      Were you aware that Peggy McBride Cannon was frequently absent from work in 2004?
A:      In 2004? If I could – if I was asked if I – if it was asked of me whether she was absent from the actual court building more than what she was there from what I could observe in a probation department on a second floor I would say that she was absent more than she was there.
. . . .
Q:      Yes.
A:      From what I could observe being in another building on a second floor I would say she was probably absent more than she was there.

(Dep. Englar, p. 121-22).

Furthermore, it is clear that Plaintiff Englar did not answer completely or truthfully when

asked by the SCAO about her knowledge about court employees performing non-court related

work during working hours. In the recorded portion of the SCAO interview, Englar told the

SCAO that she was unaware of court employees doing personal services for the Judge outside of

18

their lunch hour. (Def's Mot. Summ. J. Ex. 17)**.** However, at her deposition, Englar revealed that she clearly knew of non-court related activities occurring at 41B District Court. She admitted that she transported the Judge's son to school during the interview but claims that portion was not captured on tape. (Dep. Englar, p. 218-19). She did not report this to the SCAO because she did not remember it at the time. (Dep. Englar, p. 224-27). She also claimed that she told the SCAO about the employee who took the Judge's dog to the groomer but also claims this was during an unrecorded portion of the interview. (Dep. Englar, 230-33). However, Englar later testified that she was aware that other employees performed homework for the Judge's children, balanced the Judge's checkbook, drove the Judge's sister to the doctor, and helped the Judge move. (Dep. Englar, p. 242-49).

The First Amendment does not extend to protect false statements that are knowingly or recklessly made. *Pickering*, 391 U.S. at 574. In order to show that Defendant Judge Davis is entitled to qualified immunity on this claim, this Court "need only decide whether a reasonable official could believe that [Plaintiffs] knowingly or recklessly made false statements." *Gossman v. Allen*, 950 F.2d 338, 342 (6th Cir. 1991). Plaintiffs testified that they were fully aware that Deb Green and Judge Davis informed them that they could lose their jobs if they were not honest during the interviews. (Dep. Barachkov, p. 92-93; Dep. Diehl, p. 162-63; Dep. Englar, p. 201-06). Deb Green testified that given the interview accounts of the other thirty-one (31) employees, she was convinced that Plaintiffs Barachkov, Diehl, and Englar were not telling the truth about what they knew or observed or even covering up for the conduct of Judge Cannon and the Court Administrator. These beliefs formed the basis for their dismissal. (Dep. Green, p. 240-44). Given the conclusions of the Deb Green, combined with the inconsistencies of Plaintiffs' own

19

interviews and deposition testimony, the Court finds that a reasonable official could have concluded that Plaintiffs knowingly or recklessly made false statements.

Additionally, since Plaintiffs were not speaking as "concerned citizens," but as participants in an internal investigation, the statements do not encompass "matters of public concern." Given the context of the statements made during the course of an internal investigation, nothing about the substance of Plaintiffs' remarks evinced any intent on the part of Plaintiffs to bring to public light anything about the investigation. *See Campbell v. Hamilton*, 23 Fed. Appx. 318, 328 (6th Cir. 2001) (unpublished). Even if they were "matters of public concern," the interests of the Michigan state judicial system in discovering and redressing wrongdoing by its personnel certainly outweigh Plaintiffs' interest in making the comments in this instance. *See Pickering*, 391 U.S. at 568.

Next, Plaintiffs allege that Defendant Judge Davis violated their Freedom of Association rights by terminating them because of their close relationship to Judge Cannon and his family. There is simply no evidence put forth by Plaintiffs to support this theory. Plaintiffs Barachkov and Diehl indicated that they had no reason to believe that they had been terminated because of their relationship with Judge Cannon or his family.  (Dep Barachkov, p. 160; Dep. Diehl, p. 244-45).  Further, Plaintiff Englar stated that she thought she was terminated because of a desire to "get rid of the family," since she is McBride Cannon's sister.  (Dep. Englar, p. 117).  Beyond this statement, Plaintiff Englar has no further evidence that this was the reason for her termination. Lastly, Defendant Englar admitted that other more closely-related employees were not fired. (Dep. Englar, p. 360-61). The Court thus finds no merit to this allegation.

Third, Plaintiffs allege that Defendant Judge Davis terminated their employment because

of their "union organizational activities." Plaintiffs offer no evidence of any connection between the unionization meeting and their termination. (Dep. Barachkov, p. 153-57; Dep. Diehl, p. 240-43; Dep. Englar, p. 315-17, 394-96).  Plaintiffs, along with the other members of the 41B District Court, attended a single organizational meeting. Plaintiff Englar organized the event at her house, but did not play any greater role. (Dep. Englar, p. 116-17).

The Court finds therefore that Plaintiffs cannot establish a genuine issue of material fact that Defendant Judge Davis violated their First Amendment rights. In the alternative, since a reasonable official could conclude that Plaintiffs knowingly or recklessly made false statements, Defendant Judge Davis would be entitled to qualified immunity.

### F.      Fourteenth Amendment Due Process Claims

#### 1.      *Procedural Due Process*

In Count II of the Complaint, Plaintiffs allege that Defendants violated their procedural due process rights by not providing a hearing in connection with the termination of their employment. In connection with this allegation, Plaintiffs assert that they were "just cause" employees and not hired "at-will." Defendants argue on the other hand that Plaintiffs were "at-will" employees that are not entitled to a hearing concerning their employment termination.

The Fourteenth Amendment to the Constitution prevents states and local governments from depriving persons of "life, liberty, or property, without due process of law." Courts have consistently recognized that certain governmental employees "may have a property interest in continued employment under certain circumstances and must be afforded due process before being discharged." *Dean v. City of Bay City*, 2005 WL 3579177, *13 (E.D. Mich. 2005) (unpublished) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1986)). These

21

property interests protected by procedural due process "are defined by sources independent of the Constitution such as state law." *Chilingirian v. Boris*, 882 F.2d 200, 203 (6th Cir. 1989) (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Thus, the Court must look to Michigan law to determine whether Plaintiffs have property interests in their employment at 41B District Court.

Plaintiffs contend, and Defendants dispute, that Plaintiffs were employees who could only be terminated for "just cause." This issue is crucial for Plaintiffs since the Sixth Circuit has held that "a public employee does not have a property interest in continued employment when his position is held at the will and pleasure of his superiors and when he has not been promised that he will only be terminated for good cause." *Chilingirian*, 882 F.2d at 203. Furthermore, Michigan law has a strong presumption that "employment relationships are terminable at the will of either party." *Lytle v. Malady*, 458 Mich. 153, 164 (1998); *see Mannix v. County of Monroe*, 348 F.3d 526, 532 (6th Cir. 2003). This "presumption of employment at will is overcome with proof of either a contract provision for a definite term of employment, or one that forbids discharge absent just cause." *Lytle*, 458 Mich. at 164. Michigan law provides three avenues by which a plaintiff can show that he or she is a "just cause" employee:

(1)   Proof of a contractural provision forbidding discharge absent just cause;
(2)   An express agreement, either written or oral, regarding job security that is clear and unequivocal; or
(3)   A contractual provision implied at law, where an employer's policies and procedures instill a legitimate expectation of job security in the employee.

*Id*. (internal quotations and footnotes excluded).

In the absence of any evidence of an express contract or express agreement, Plaintiffs rely upon the "legitimate expectations" prong to establish "just cause" status. To evaluate

22

"legitimate expectations," Michigan courts examine the following two considerations: (1) What

the employer has promised and (2) Whether that promise is "reasonably capable of instilling a

legitimate expectation of just-cause employment..." *Id*. at 164-65 (quoting *Rood v. General*

*Dynamics Corp.*, 444 Mich. 107, 138-39 (1993)).

In their Response to Defendants' Motion for Summary Judgment, Plaintiffs list the

following as evidence that they were "just cause" employees:

(1)     No written at-will policy;
(2)     It is "uncontested" that all 41B District Court employees are "just cause";
(3)     41B District Court employees were "consistent" with those of the City of Mount Clemens;
(4)     No supervisor at 41B District Court testified that the court employees were "at will";
(5)     Judge Cannon's testimony that Plaintiffs were "just cause" employees;
(6)     Clinton Township employees are "just cause";
(7)     Clinton Township employees confirmed to the SCAO that the court followed Clinton Township policies;
(8)     Administrative Order 1998-5 requires district courts to the extent possible to adopt the funding units's personnel policies.

However, the only evidence that Plaintiffs produce that support of their argument include

(a) testimony of Judge Cannon, (b) testimony of Plaintiffs Barachkov and Englar, and (c)

Administrative Order 1998-5 ("AO 1998-5") and Clinton Township Overtime and Disciplinary

Procedures Memo ("Clinton Township Policies").

Defendants argue the following in opposition:

(1)     Progressive disciplinary policies do not create just cause employment as a matter of law
(2)     Several affidavits from 41B Court personnel claiming that the Court reminded the employees of their at-will status
(3)     Since Plaintiffs Barachkov and Diehl were unaware of the disciplinary policies during their employment, neither could have a "legitimate expectation" of "just cause" employment.
(4)     Plaintiff Englar's testimony is insufficient to create a court-wide policy of just cause employment

23

(5)    Clinton Township's Policy on its face only applies to unionized employees covered by the civil service system.

(6)    The SCAO did provide a due process hearing to Plaintiffs.

The Court finds that Plaintiffs' evidence that they were "just cause" employees is insufficient to create a genuine issue of material fact to avoid summary judgment.

Plaintiffs argue that AO 1998-5 read in conjunction with the Clinton Township Policies creates "just cause" employment for the employees of 41B District Court. In other words, these policies created a "legitimate expectation" that their employment would only be terminated for "just cause." *See Rood*, 444 Mich. at 117. The relevant language in AO 1998-5 states:

> To the extent possible, consistent with the effective operation of the court, the chief judge must adopt personnel policies consistent with the written employment policies of the local funding unit. Effective operation of the court to best serve the public in multicounty circuits and districts, and in third class districts with multiple funding units may require a single, uniform personnel policy that does not wholly conform with specific personnel policies of any of the court's funding units.

It is not disputed that there were no court-maintained published policies, procedures, or handbooks distributed to the employees of 41B District Court describing employment status. (Dep. Cannon, p. 42).[5]

Taken as a whole, Plaintiffs' testimony and the Clinton Township Policies do not lend support to the existence of a "just cause" employment relationship. There are several problems with Plaintiffs' interpretation of the effect of AO 1998-5 upon the Clinton Township Overtime and Disciplinary Policies. First, although AO 1998-5 orders the chief judge to adopt "personnel policies  consistent with the written employment policies of the local funding unit," there is no

---

[5] Excepts from the deposition of Judge William are found in Plaintiff's Supplemental Brief in Response to Defendant's Reply to Plaintiff's Response in Opposition to Motion for Summary Judgment, Exhibit No. B. (Docket No. 60).

evidence that the chief judge ever did so in this instance. Furthermore, AO 1998-5 by its terms is to be read in conjunction with Michigan Court Rule 8.110 which deals with the responsibilities of the chief judge of circuit and district courts. Plaintiffs argue that the language "must adopt the personnel policies of the funding unit" means that the Clinton Township Disciplinary Policies, which include progressive discipline and "just cause" employment, apply to the 41B District Court employees. By implication, Plaintiffs repeat, without any support, that all Clinton Township employees can only be terminated "for cause."

Defendants appear to argue that Clinton Township had several categories of employees *inter alia*: (1) civil service employees (that require testing for their positions), (2) unionized jobs (covered by a collective bargaining agreement), and (3) at-will employees. Defendants are correct that the Clinton Township Disciplinary Policy on its face expressly applies to employees "covered by the Employee Civil Service system." Plaintiffs admit that they were neither members of the "civil service system" as contemplated by the Policy nor were members of any union that bargained for the agreement. In fact, the express language of the Policy supports this interpretation by stating that "[t]he Township's *labor agreements* and its *Civil Service Rules* adopt a 'just cause' standard in administering discipline." (emphases added). That would necessary mean that the Policy would not apply to at-will employees of the Township. Furthermore, the Overtime Policy explicitly applies only to "salaried employees." All three Plaintiffs were hourly employees at 41B District Court. Nothing in the language of AO 1998-5 can be interpreted to mean, for instance, that circuit and district courts are required to adopt the agreements pertaining to the Township's unionized or civil service employees and apply them to the court's otherwise at-will employees. The fact that Plaintiffs were involved in efforts to

25

unionize the court employees lend support to the theory that the court employees did not automatically enjoy the benefits of union membership. Therefore the Court finds that AO 1998-5 read in conjunction with the Clinton Township Overtime or Disciplinary Policy does not create a "just cause" employment relationship for the employees of 41B District Court.

Furthermore, Michigan courts have held that under a "legitimate expectations" theory, the "policies [must be] *reasonably capable* as being interpreted as promises of just-cause employment." *Rood*, 444 Mich. at 140 (emphasis added). Furthermore, "a contract for discharge only for cause may not be based on a mere *subjective* expectancy." *Mannix*, 348 F.3d at 534 (citations and internal quotations omitted) (emphasis added) (applying Michigan law).

To establish that Plaintiffs had a "legitimate expectation" in continued employment for the purposes of establishing "just cause" status, Plaintiffs introduce the deposition testimony of Judge Cannon and Plaintiffs Diehl, Englar, and Barachkov. First, the Court finds as a matter of law that Plaintiff Diehl did not have any "legitimate expectation" of continued employment. Plaintiff Diehl testified in her deposition that she did not know whether 41B District Court ever adopted an employment policy and was unaware of the Clinton Township Disciplinary Policy. (Dep. Diehl, p. 90-94, 100-02, 112-13). Therefore, Plaintiff Diehl cannot show that she had any expectation of "just cause" status.

Furthermore, the testimony of Judge Cannon and Plaintiffs Barachkov and Englar establishes that they only had "subjective expectations" of "just cause" employment under Michigan law. Judge Cannon testified that it was his general practice to generally provide for notice, progressive discipline, and just cause employment. (Dep. Cannon, p. 108). However, he qualified that statement by testifying that he adopted the Clinton Township policies as "his"

26

procedure, selectively using "some parts of it and disregard[ing] others." (Dep. Cannon, p. 116, 133-34). He stated that he also never communicated or had a meeting with the employees to identify which parts of the policy that he was implementing. (Dep. Cannon, p. 134). He further admitted that he never terminated or disciplined any employee under that policy. (Dep. Cannon, p. 118). All parties and witnesses agree that there were no written employment contracts, no negotiations over terms of employment with Plaintiffs, nor formal written employment policies. (Dep. Cannon, p. 36, 115; Dep. Barachkov, p. 178-79; Dep. Green, p. 211-21). Judge Cannon further testified that he did not recall giving the Clinton Township Manual to Plaintiff Englar. (Dep. Cannon, p. 82). Finally he admitted that he did not even employ the disciplinary procedure outlined in the Clinton Township Policy and just "used whatever [he] felt was most effective at the time." (Dep. Cannon, p. 155-56).

Plaintiff Barachkov testified that although she received the a physical copy of the Township Policies, no one from 41B District Court ever explained the procedures to her. (Dep. Barachkov, p. 63, 67-68). Furthermore, she admitted that by its own terms, the Overtime Policy did not apply to her. (Dep. Barachkov, p. 64). She also stated that she was not a member of the employee civil service system nor was a union member, as described by the Disciplinary Procedures. (Dep. Barachkov, p. 68-69). Her testimony, as whole, demonstrates at best that she only had a "subjective" expectations of "just cause" employment.

Plaintiff Englar testified that she received a copy of the Clinton Township Disciplinary Policy sometime in the mid-1990s, although she was hired in 1981. (Dep. Englar, p. 39, 58). Although Englar was aware that she was a not a "civil service" employee as stated by the Policy, she stated that she thought she was "considered a civil service employee," although she admitted

27

she did not meet any formal requirements. (Dep. Englar, p. 73). Englar further stated that she did

not even remember if she was given a copy of the Clinton Township Overtime Policy. (Dep.

Englar, p. 177). Finally, Englar testified that there was nothing that had happened during her

employment with the court to lead her to believe that employees were provided a hearing upon

termination. (Dep. Englar, p. 298-99).

Moreover, under Michigan law, the adoption of disciplinary procedures, without

something more, is insufficient to establish a "just cause" employment relationship. *Biggs v.

Hilton Hotel Corp.*, 194 Mich. App. 239, 241-42 (1992). However, "while a specific list of

disciplinary violations may help establish a legitimate expectation of just-cause employment, it

is not by itself sufficient to create such an expectation." *Mannix*, 348 F.3d at 534 (quotations and

internal citations omitted); *Mitchell v. White Castle*, 1996 WL 279863, at *5 (6th Cir. 1996)

(unpublished) ("Neither the adoption of systematic procedures nor creation of disciplinary

guidelines transforms an at-will relationship into one prohibiting discharge except for just-

cause"). For instance, in *Bailey v. Dover Elevator Co.*, 1994 WL 198194 (6th Cir. 1994)

(unpublished) (applying Michigan law), the court found that simply the introduction of a

progressive discipline policy, without "proof that defendant made any representations that an

employee could only be discharged after the procedures had been followed," did not create a

triable issue of material fact. *Id*. at *3. Furthermore, when progressive disciplinary procedures

are (1) discretionary by their own terms or (2) do not create an exclusive list of reasons for

termination, that is also insufficient to create a "just cause" relationship. *Biggs*, 194 Mich. App.

at 241-42; *see Muse v. Lansing Housing Comm'n*, 2004 WL 60299, at *1 (Mich. Ct. App. 2004)

(unpublished). The Clinton Township Disciplinary Policies were discretionary by their terms,

thus not creating an expectation of "just cause" employment.[6] *See Biggs*, 194 Mich. App. at 241-42. Finally, Plaintiffs could not testify that any supervisory personnel ever made any explicit representations that the employment relationship was "just cause." Therefore, Plaintiffs have not produced sufficient evidence to demonstrate that they had legitimate expectations of "just cause" employment. *See Mannix*, 348 F.3d at 354. Therefore, Plaintiffs' procedural due process claims fail.

### 2. *Substantive Due Process*

Plaintiffs allege in their complaint that Defendants denied them a "name clearing hearing" in violation of their Fourteenth Amendment rights. It is well-established that a person's reputation and good name are among the liberty interests protected by the Fourteenth Amendment from damage by public government action in connection with a termination of employment or refusal to rehire. *Paul v. Davis*, 424 U.S. 693, 707-08 (1976). When a "nontenured government employee shows he has been stigmatized by the voluntary, public dissemination of false information in the course of a decision to terminate his employment, the employer is required to afford him an opportunity to clear his name." *Feterle v. Chowdhury*, 148 Fed. Appx. 524, 531 (6th Cir. 2005) (unpublished) (citing *Codd v. Velger*, 429 U.S. 624, 627-28 (1977) (per curiam)). "A name-clearing hearing is required only when a nontenured public employee is dismissed from his or her job and publicly stated reasons that reflect on the

---

[6]The relevant section of the Clinton Township Disciplinary Action Procedure reads:

A system of progressive discipline *may be used* for the purpose of encouraging an employee to correct unacceptable behavior and to adhere to Township and Department rules and regulations. The Township *reserves the right to determine those steps necessary* considering all aspects of each individual case. (emphases added)

terminated employee's honesty or integrity are relied upon, either explicitly or implicitly."

*Ferencz v. Hairston*, 119 F.3d 1244, 1250 (6th Cir. 1997).

Plaintiffs claim that 41B District Court and Clinton Township publicly disseminated false charges that "stigmatized Plaintiffs and severely damaged Plaintiffs' opportunity for future employment." However, the Sixth Circuit has repeatedly held that in order to bring a liberty interest claim a plaintiff is "required to show that he requested a name-clearing hearing and was denied that hearing." *Quinn v. Shirey*, 293 F.3d 315, 322 (6th Cir. 2002). Since Plaintiffs never requested a name-clearing hearing, their claim fails as a matter of law.

### G.   Pendant State Law Claims

The Court exercises its discretion and dismisses the pendant state law claims, Counts III – VII, without prejudice.

### CONCLUSION

The Court **GRANTS** Clinton Township's Motion for Summary Judgment on Counts I and II.

The Court **GRANTS** Defendant 41B District Court's Motion for Summary Judgment on Counts I and II.

The Court **GRANTS** Defendant Judge Davis' Motion for Summary Judgment on Counts I and II.

The Court **DISMISSES WITHOUT PREJUDICE** Plaintiffs' pendant state law claims, Counts III – VII.

**SO ORDERED**

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 22, 2006

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on September 22, 2006.

s/Denise Goodine
Case Manager

31